Again, we'll give everyone a minute to get settled at council table and then adjust the elect your attorney. Hoffman, I think you're going to be first up. So yeah, feel free to adjust that. And I understand you would like to reserve two minutes for rebuttal. Is that right? Yes. Please, whenever you're ready. May it please the court. My name is Piper Hoffman. We're here today because of USDA regulations that, contrary to Congress' mandate, give enormous authority to private slaughterhouses and cause two primary problems. First, the regulations take private employees who have no training, very high turnover, and no protection from employer retaliation and makes them the front line responsible for protecting us from the next major disease outbreak. Is that really so? I mean, all that those private employees can do is veto the slaughtering of a pig, right? Or either veto it completely or set the pig aside for further inspection by the USDA. The employees do a couple of different things. One is they can take animals before any inspector has seen them, sort out the ones that they, without training, consider to be moribund or to have a central nervous system disorder or pyrexia, remove them and dispose of them without any inspector ever seeing them. Yes. Well, except without an inspector ever seeing them, but there's a separate requirement that the USDA has to oversee the methods of slaughter and maintenance of the facility, right? That requirement is in the statute. I argue that it is not being implemented. It is in the final rule. The final rule mentions three instances when inspectors need to verify that handling is humane during the employee sort, remove, and dispose process. But then that means that your argument here is that this rule is unlawful because the FDA is, or sorry, the USDA is not separately enforcing some other requirements to oversee the methods that the slaughterhouse employs. The regulations are unlawful for several reasons. They're violating... This argument that you're making now about how, you know, these private employees have just unfettered discretion to do whatever they want in terms of these animals, they don't really under the statute. You're just saying that the USDA is not enforcing some other statute that requires them to exercise oversight over all of the methods of slaughter. No. The humane handling requirement is also in the Federal Meat Inspection Act at 603B. So we're talking about the same statute, 603A and B. And secondly, it's not that employees have unfettered discretion with respect to these animals. It's that the usual guardrails for employees and for slaughterhouses are absent. If you look at Section 602 of the statute, Congress states that the purpose is to keep unwholesome and adulterated meat out of the public food supply. What happens with sorting, removing, and disposing is that employees are entrusted with taking certain animals, disposing of them, and ensuring that they do not enter the food supply. That's in 309.19C. It's one of the regulations. So I guess the question is, what is the harm of that if what they're doing and all that they're empowered to do is to literally take animals out of the food supply system? The ones that go into the food supply system are going to be inspected by the USDA, right? So the harm in that is that slaughterhouses are for-profit businesses with incentives to sell as much as they can. allows potentially diseased animals to enter the system without inspection. And the question that we keep asking, and I'm not sure I've gotten a clear answer to it yet, is, isn't it the case that the only thing that the private employees do without supervision by the USDA is to take animals out of the slaughtering process? And the food production system? Yes. The regulations direct them to dispose of those animals. Right. So if they, in fact, took them out of the line, and then somehow they snuck them back into the food supply, that would be a violation of the regulation. It would, and it also opens a loophole in the Federal Meat Inspection Act that undermines the purpose. Which purpose? The purpose is to keep them out of the food supply, as you just said. If, in fact, they're out of the food supply, how does that undermine the purpose? Allow me a minute to give you some history about the Federal Meat Inspection Act. Well, actually, could you just start by answering Judge Menachie's questions directly, and then you can turn back to the history. So I want to hear, what's the other purpose? Understood. The purpose is keeping diseased meat out of the food supply, and the regulations direct employees to do that. That doesn't mean that's what's going to happen. The court is not required to make itself naive. The court is allowed to bring the same thought to a law that... So the argument is you think that even though the regulations do aim at keeping the diseased animals out of the food supply, it's going to be easily evaded and we shouldn't trust... The USDA is putting too much trust in the staff of the facility to abide by the regulation. The USDA is violating 603A. It says USDA is responsible for keeping diseased meat out of the food supply. Well, it says the USDA is responsible for inspecting the animals, you know, on the day of slaughter before they enter a slaughtering establishment to be offered for slaughter and to end up in the food supply, right? Among other things... So in effect, if animals are not being offered for slaughter or to enter the food supply, it's not clear that the statute requires the USDA to inspect those animals. It does. 603A requires inspectors appointed for the purpose to inspect all animals that arrive at the slaughterhouse for the... Wait, wait, wait. Let's talk about the language of the statute, not a paraphrase of the statute. Okay. It requires the inspection by the USDA of all amenable species, which I think it's conceded on both sides doesn't just mean pigs as well as cows. It means every pig, right? Correct. Before they shall be allowed to enter into any slaughtering establishment in which they are to be slaughtered. So isn't the statutory interpretation question whether the slaughtering establishment in which they are to be slaughtered means the entire premises owned and operated by the slaughtering company or just means the killing field, the killing building, the slaughtering butchering where the nasty stuff happens, right? That's the question is which the statute means. That is one of the questions, yes. Was there another question? Yes, there are questions about 603B and humane handling. That's different. Okay. Because that has another problem because that requires the USDA to worry about the methods. It doesn't, it's not quite the same thing. Granted. As saying they have to make sure that every animal is treated according to the appropriate methodology that is being generally used. It talks about they look to the methods and that's what they look at. But that's a separate problem. We haven't been talking about that at all yet. We've been talking about your contention that what the USDA is now allowing violates this particular provision, right? And I guess what I'm asking you is isn't the relevant statutory interpretation question as to that issue whether the slaughtering establishment means the outer perimeter where the trucks come and enter a premises with a sign above, you know, all hope abandoned pigs who enter here. That's what establishment means. Or whether the establishment in which they are to be slaughtered means the actual killing building or place. Correct. The place where the killing is going to take place. Yes. That's the question. Yes. No other question about that, whether this question applies. Sorry. No, the answer is yes, that it means when they enter, when they arrive at the premises at large. So if the farmer, excuse me, if the farmer says, boy, this pig is really not going to pass inspection and takes that pig out of distribution, that's not a problem because that takes place outside the premises. Correct. But none of these inspections actually take place. FDA or USDA or otherwise outside the premises before they enter in. Right. It all takes place on the grounds of the establishment, no matter who's doing it. Correct. Isn't that right? Yes. In fact, since 1906, right, the regulations have said the inspection occurs in a pen on the facility of the slaughtering company. Right. Yes. So USDA, since 1906, has understood this language about a slaughtering establishment to be the particular slaughtering facility on the grounds of the company.  No. I don't believe that's. How could it possibly be that the inspection was allowed to occur on a pen on the grounds of the company before they enter the slaughtering facility if the statute required the inspection to occur before they get onto the grounds in the first place? The only explanation that reconciles that practice with the language of the text is to take a functional understanding of the word enter, enter the, I want to get it, enter into any slaughtering establishment to mean entering into the slaughterhouse's possession.  But they're in the pen, right? No, not necessarily. If they're on the premises of the company that's going to slaughter them and they're in a holding pen outside the slaughtering facility, they're in the possession of the slaughtering company, right? The U.S. government has argued that the slaughterhouses do not purchase animals, that that transaction is not finalized until the animals are slaughtered and passed post-mortem inspection. Well, that means that even during the slaughter, they're not in the possession of the company. According to the U.S. government, yes. Well, that can't possibly be the reason for this practice, right, because that doesn't reconcile with the language of the statute. I believe that it is the reason for the practice. I believe there's also... Well, it's never been said. We think that slaughtering establishment means the part of the facility in which the slaughtering occurs. But that interpretation makes no sense. I think about it two ways. I understand in some sense we talk about an establishment as being the whole company, right? But you could have a whole grounds that includes different kinds of establishments, right? So if I run a hotel that includes a restaurant and I said, where's the dining establishment? It would be the restaurant within the hotel. It wouldn't be the whole thing, right? So you could understand establishment maybe either way depending on the way the thing operates, right? No. Why not? Because why would Congress pass a law saying that anything has to happen before a live pig walks into a canning building? It doesn't happen. That's why the USDA has to... That's where the slaughter is going to occur, right? Right. The whole thing only... Whatever happens in meat canning or rendering facilities, which is not part of our record and we don't know anything about, whatever goes on there, the only time that this whole provision applies is when they're entering an establishment in which they are to be slaughtered.  So if you're saying that never happens in a canning facility, then I guess the canning facility language is just surplusage. The government argues... Because this provision would only apply to a meat canning establishment in which the animals are to be slaughtered. Yes. I mean, wouldn't it be the case that you have a kind of company that does slaughter to sell meat to butcher shops and then also another part where they slaughter them and prepare them for canning to go to grocery stores or whatever and they have different types of it and Congress is just saying, no matter what you're doing, whenever you put them into the process to be slaughtered, that's when you do the inspection. And in that situation, when you enter that establishment is when you enter the premises, as the Supreme Court held in National Meat Association v. Harris. The government tries to reconcile this language by saying that this actually refers to different buildings on a slaughterhouse's premises. And failing that, it argues that there needs to be new language written into the text in order to understand it. Namely the phrase, if the establishment's choices prevail. So the government would have this read, By inspectors appointed for that purpose, an examination and inspection of all amenable species before they shall be allowed to enter into any slaughtering, packing, meat canning, rendering, or similar establishment in which they are to be slaughtered if the establishment's choices prevail. Wait, wait, wait. I don't understand what that language means, let alone why the government would have to stick that in. Because all you have to do to sustain the government's position is to say that these animals are being inspected before they are allowed to enter into the establishment, whatever you call it, to be slaughtered or canning or whatever else, before they enter the establishment in which they are to be slaughtered. And if that is interpreted to mean the place where they are going to be slaughtered, first of all, that's the thing that most neatly, it seems to me, and you can tell me why I'm wrong, that most neatly fits the purpose of keeping the diseased animals out of the food supply. Because they're not in the food supply if they're sitting in a pen somewhere waiting for what is hopefully humane killing, or while they're in another pen waiting for the USDA inspectors to come and verify whether they should be sent to that other pen or allowed to get on the assembly line and march to their deaths. Under that interpretation, what do we do with packing, meat canning, rendering or similar establishments? Are you saying that in which they are to be slaughtered somehow modifies only the slaughtering establishment and not the meat canning or rendering? I'm saying that animals... Is that what you're saying? No. No. Okay. So what are you saying? I'm saying that animals will not be slaughtered in the other establishments. Yes. Exactly. If they're not going to be slaughtered in those establishments, then this provision does not apply. Then that language is... It's only when they're entering the place where they're to be slaughtered. Then that language is surplusive. You'd agree if they're slaughtered somewhere and then the carcass is brought to a canning establishment to be canned, the inspection should not occur at that... The antemortem inspection should not occur at that point, right? It has to be before they're slaughtered. Correct. So whatever a canning establishment is where you need to have an antemortem inspection, it has to be one in which the slaughter occurs. This provision is specifically about antemortem inspection. Right. Yes. It has to happen at the establishment where they are going to be slaughtered. Okay. Just in terms of your position, is your position that since 1906, when the USDA has had this practice of allowing the inspection to occur in a pen before they enter the actual slaughtering facility, has that been inconsistent with the statute for 120 years? I'm not familiar enough with that history to say, but not that I know of. So do you think it's inconsistent with the statute to do the inspection when the animals are in a holding pen on the premises of the company that's going to slaughter them before they enter the slaughtering facility? It is not consistent with the statute if the statute is understood to mean that the inspection must happen before they enter specific buildings or after the establishment has chosen whether to present them for slaughter or not. Okay. Can I ask about the standing? I was just going to say we've spent a lot of time on this. If we could change gears.  I know we've kept you up for a little while, but yeah. So can I ask about this? So for animal equity and animal outlook, right, it seems like the standing that they talk about is they're going to have to devote more resources to advocating for the humane treatment of animals, right? No. Why not? That is why— Yes. So that is that they're going to have to do more work. So the Supreme Court in the Alliance for Hippocratic Medicine says they contend that the FDA has forced the association to spend considerable time, energy, and resources engaging in public advocacy and public education, but an organization that has not suffered a concrete injury caused by a defendant's action cannot suspend its way into standing simply by expending money to gather information and advocate against the defendant's action. Why isn't that exactly the standing claim here for animal equity and animal outlook? Because animal equality, animal outlook, and farm sanctuary do not need to be found to have actionable injuries based on every word of their declarations. For animal equality, one of the core business activities is corporate engagement. The organization works with companies to help them make their practices more humane because that is appealing to consumers. Because of the regulations, there are two different injuries to that core activity. One is that animal equality must retrain volunteers and staff. It must change the training materials and that involves operational costs. But isn't that an advocacy thing that you're choosing to do? So your advocacy is costing more, no? I believe the important point is that these are... Hypothetically, any time any of the slaughtering laws change, presumably animal equality is going to have to change its training, right? Maybe for the better, maybe for the worse, you don't know. If it's relevant. But if there's a major overhaul of the USDA laws on slaughtering, you can't go in there and lecture corporations on the old statute, right? Yes. So I think if we follow your logic, every time the USDA's laws that they're administrating are changed, you're going to have a concrete injury. Is that not the logical implication of your position? If I may complete the argument. Well, why don't you just answer my question and then you go back. Is that or is it not the logical implication of your position? If I presented it, yes.  So then give me the explanation for why that's not a problem for you. Because that's not the entire injury. Oh, okay. So what is the injury then? So this is not a cognizable injury, the one I said about retraining because there are new laws. Is that what you're saying? I'd say no, it's not the entire injury. Well, what's the part of the injury that establishes that it's sufficient for articulation? Yeah, and actually if I could just finish on this one. So if you're saying it's not a problem because it's not the entire injury, that seems to suggest you need another part of the injury to get injury in fact. Because otherwise, if what I just said is a sufficient injury, you wouldn't need to answer it's not a problem because there's another injury, right? Okay. So I just want to understand. Well, I don't want you to just agree with me because we're agreeable. But are you saying that you concede that the part I just articulated is not an Article 3 cognizable injury in fact? That every time the laws change, you've got to retrain your folks? Yes. Okay. So then you're saying there is something else that is a cognizable injury in fact. Yes. Why don't you tell me what that is? I'd like to look at farm sanctuary. So I want to talk about farm sanctuary. But does that mean that you're conceding that for animal equity and animal outlook, they don't have standing? No. But the plaintiffs need only one organization to have standing. We're going to take this step by step. We're on animal equality. I want to figure out if they've got standing. And you suggested that there is another injury they suffered besides the retraining. Yes. What is that cognizable injury? That injury is harm to fewer corporations who might be interested in engaging with animal equality on making practices more humane. So let me ask you this hypothetical. Let's say the federal government bans the slaughter of animals and says everyone in America must be vegan. The entire mission statement of animal equality is out the window. You're saying you have a concrete injury because now you're going to have no clients?  Okay. So how is that consistent with the argument you're making? Because animal equality will have a higher burden to persuade corporations that it's worth going humane. But that's a higher burden of convincing them to agree with you. See, I just posited that you're out of business, right? In the government goes vegan world, you have an incredibly high burden of convincing companies to listen to you, to have your trainings, because there is now zero need for you, right? Yes. But you're not injured by that because that accomplishes the very goal that you were trying to get the companies to do. Exactly. But that's only true if, I thought, you disagree with what the Supreme Court has said is that your injury can't be that your moral objectives are not being served, right? That the world is not aligning with your moral and ideological view of how the world ought to be. Agreed. So that's why I'm positing if it's a question of no one's going to buy your services anymore or something, then why is it that, again, in a world where the government says everyone go vegan, no pigs shall ever be slaughtered again, or let's go broader, no animals shall ever be slaughtered again, I thought you were saying that you would not have an injury in that case. No. So then how is it I don't understand the logic then of how you have injury here? Unless you're going with the idea that part of the injury is the psychic injury that, again, the world is not aligning with your moral and social goals. No. That is not part of the injury. So what's the injury then? Think of it as animal equality selling a service to companies. It sells the idea that customers may be more likely to purchase items that are humane, may even spend more money on items that are humane. But now, given that all pigs will end up in these slaughterhouses, at least 93% of them, according to the final rule, will be slaughtered in an inhumane manner, it doesn't mean much if you say on the package that the meat is humane. What do you mean they will be slaughtered in an inhumane manner? I don't get where that is somehow now a premise. I'd like to take a moment to talk about humane handling and why that is a premise. Why wouldn't it matter if it says on the package that the slaughter is humane? Why couldn't animal equity say, you know, we certify that this company achieves a standard beyond that required by the regulators? During slaughter? Yeah. Because they can't. Like organic packaging. The USDA doesn't require things to be, you know, hens to be whatever free-range chickens or something. But people put that on the label of their eggs all the time. Oh, these are free-range chickens. And you would say, hey, this is value-added. Don't go to those slaughterhouses. Go to the ones that get our good housekeeping seal of approval. However. Why does that? Because however humanely the animals are raised, they must go to these slaughterhouses. No, no. I think you're missing the point of the question. It's not about the difference between free-range chickens and pigs at the slaughterhouse. The question is, if the service that is provided by animal equality to the companies is that consumers would like it if pigs were humanely slaughtered, then that doesn't have anything much to do with government regulation.  The government could be a part of the sales pitch. Look, the government is now allowing all these terrible things to happen. If you really want to reach those consumers who actually care about animals, you're not going to reach them by just saying we comply with the USDA. The only way you're going to reach them is by buying our seal of approval. It would be false. Why would it be false? Because the pigs must all be slaughtered at slaughterhouses governed by these regulations. Producers cannot opt out of them for something more humane. But the regulations set a floor, right? And if the company wants to do – so let's say the regulation allows the line speeds to be faster. If a company says, no, we just want to do only so many pigs a day, we want to have slower line speeds and take extra care with the inspections, nothing prevents them from doing that, does it? The regulations allow slaughterhouses to opt into this system. And in the final rule, USDA predicted that 93% of pigs would be slaughtered under this regulation. That's their prediction. That's not what we're talking about here. What we're talking about here is the very fact that you just – the thing you just said. It allows the companies to opt into this system. So they can also opt out, right? Yes. So why can't animal equity do – animal equality do something useful in the world of people who care, consumers who care about humane slaughtering of animals? By convincing a company, you should really opt out of this system and you can do something completely different and better than this system. Because there's a – Why would that be – As a practical matter, that is not possible for most producers. Slaughterhouses are very concentrated. They're large and pigs are trucked from very far away to go to the one slaughterhouse that is regular. So then you're saying that animal equality is actually wrong, that consumers don't care enough to pay any kind of premium that would require a company to do something special and good. The only thing that they care about, if they care about anything at all, is that the government standards are complied with? No, no. I'm not saying that at all. I'm saying that consumers' preferences do not shape reality all the time. Right. And in this situation, these regulations ensure that slaughter that is humane is all but inaccessible for the most producers of pork. Whether consumers would like the slaughter to be more humane, whether the producers would like the slaughter to be more humane, whether animal equality would like it, it is not up to them. It is up to the regulations. So why don't we do this? Why don't we shift? Unless you have another question. No, I was going to ask about Farm Sanctuary. I was going to say – Let's get to Farm Sanctuary. We've got a few other plaintiffs here and I think – We only need one plaintiff. Right. So can I ask this question about Farm Sanctuary? So Farm Sanctuary alleges the regulations increase the risk that disease will proliferate. Pigs are thus more likely to carry dangerous illnesses when rescued because of increased inhumane handling. Rescued pigs will be more likely to have injuries and ailments and will be more expensive. So in Alliance for Hippocratic Medicine, the Supreme Court says the doctors cite various monetary-related injuries that they allegedly will suffer as a result of FDA's actions. Those standing allegations suffer from the state problem of lack of causation. A federal agency increases a speed limit from 65 to 80 miles an hour. Does an emergency room doctor have standing to sue because he may have to treat more car accident victims? The answer is no. Right. So the Supreme Court says, well, public policy, that means that you might have to do more if you want to achieve your mission, does not confer standing. Because it's discretionary as to whether you treat them and that's not a basis for challenging the public policy. So why isn't that also dispositive of Farm Sanctuary's standing? Isn't this the same thing as a federal agency increasing a speed limit and that might lead to more car accidents?  But you don't have standing because you might have to treat the patients. I take Your Honor's point that merely increasing the number of animals that need rescuing is not sufficient to confer standing. Making the animals who need rescuing sicker is a pocketbook issue for Farm Sanctuary because screening new animals, treating them, protecting existing animals costs money. But why is it a pocketbook issue? I mean, Farm Sanctuary does not have to rescue all the diseased pigs in the world, right? If you lack the capacity to take on all the diseased pigs that are out there, you're not compelled to do that. Granted. So then how is it a pocketbook issue? If Farm Sanctuary were to rescue exactly the same number of pigs next year, it's likely that disease will have spread and those pigs will cost more to screen medically, to treat, and to care for afterwards because of these diseases that have spread as a result of the regulation. Can I ask you this? We're at summary judgment now, right? Yes. Did you introduce any affidavits supporting any of this? Or is it all in the complaint? No, there were declarations introduced in the district court. About there being a likelihood of increased illnesses on the part of the pigs? I'm just curious because I'm not sure I think Judge Menasche's point is well taken, but I'm just wondering if all of this is basically the sort of thing that would have been great to argue when we had a complaint. And we had a motion to dismiss stage, but now we're at summary judgment, and where's the proof? And in light of the intervening change in law, we would request, if it doesn't seem like there is a basis for organizational standing, we would request remand so that the factual records can be dealt with. Why don't we go to Animal Outlook then, which is number three. And I guess I'm just going to front my question there is my understanding of the purported injury in fact there is that the NSIS effectively eliminates these various inspection reports that Animal Outlook relies on. I didn't see any detailed description of what the information is contained in these reports. Is that in the record, in the summary judgment record? I don't believe that it is. So is there any basis for us to say that the elimination of these reports causes injury in fact when we haven't any information in the record about what is in these putative reports? I think this is where remand would be helpful, or in the alternative, the associational standing that Farm Sanctuary makes. And it is included in the declaration. Okay, so then go to the associational standing. Okay, actually before the associational standing, just about the reports. So this was also an issue in Alliance for Democratic Medicine, right? So the Supreme Court says that most of the medical associations suggest that FDA is not properly collecting and disseminating information about methamcrystone, which the associations say in turn makes it more difficult for them to inform the public about safety risks. But the associations have not claimed an informational injury. And in any event, the associations have not suggested that federal law requires FDA to disseminate such information upon request by members of the public. So you don't in this case either have a claim that there is a statute that requires the Food Safety Inspection Service to produce these reports, right? No, we argue this is an informational injury, similar to that in the PETA case cited in our brief, where they were found to have organizational standing based on the loss of exactly this kind of information. Okay. Why don't we go to the associational standing, because we have kept you up for quite a long time. And we don't want to be inhumane. Would you maybe address that? And I understand the associational standing for Farm Sanctuary. Does that turn entirely on the allegations regarding Mr. Washburn, the chef? Currently, those are the only allegations in the record.  And is there any ñ because, again, we're at the summary judgment stage. Yes. Tell us why the dangers to Mr. Washburn that, let's say, he's either going to eat contaminated pork or he's going to serve it to his clients is anything more than speculative. And, again, focus on what's in the record, summary judgment record. The injury is the exposure to increased risk. And that is not speculative, given that in the record, USDA projected that 93 percent of pigs would be slaughtered under the regulations. Mr. Washburn eats pork. He serves it to customers. They will definitely be facing an increased exposure. I thought it said that the final rule said that it expects that high-volume establishments will be more likely to participate in ISIS. And I guess that's how one pronounces it, NSIS. In the final rule, USDA says we project that 93 percent of pigs to be slaughtered will be slaughtered in plants that opt in. I thought it was that the 40 high-volume establishments handled 93 percent. And all of them. And that they are more likely, those establishments are more likely to join in. Did it say that they are in, or? That was my reading, and if you give us a moment, we can bring up that final rule or discuss it on a rebuttal. And I guess the other question is, I don't know, has there been anything, was there anything introduced in the record about, well, I guess I don't know what the timing of all this was, that anybody has gotten sick due to this? In the record, no. Okay, so can I ask this question? So I take it that there's a factual question about whether it actually increases their risk. But just this argument means that anybody who eats pork would have standing to challenge the rule, right? If that's the claim, this guy just, you know, consumes pork. It's not that he has some kind of special relationship to pork slaughtering. Correct. So anybody who eats pork would have standing to challenge the rule. And expects to continue eating pork. By the same token, anybody who drives would have standing to challenge a traffic safety regulation, right? Does it lead to an increased risk to the extent that it changes the risk of driving? The theory of injury based on the exposure to risk that was established in Bauer v. Veneman was established in a context of food safety, in this precise context. So there's a special standing rule for food safety? I'm saying it has, as far as I know, it has not been extended outside of that context. Okay. But is there a reason why there would be special rules for food safety? That's something I would have to consider. Okay. We have kept you up quite a long time. We thank you very much. And believe it or not, we're going to see you again for two minutes of rebuttal. But we are going to keep it to two. Thank you. Thank you, Your Honor. Have a drink. Take a breath. And why don't we hear from counsel for the appellee, Attorney Hazel. Good morning, Your Honors. May it please the Court, Stephen Hazel for the government. Good morning. And if you could indulge me, would you mind just starting where we left off so it's all fresh in our mind with the standing questions? Absolutely, Your Honor. Obviously there are many different standing theories here. I think from the podium, counsel actually conceded a number of them. I think we have three overarching points that kind of address all of them, and that may be a way to cut through some of this. Would you also mind maybe tilting the microphones up a little bit? We want to make sure we hear you. Hopefully this is better, Your Honor. Just keep your voice up. Yes. So the first of those three points, the factual premises underlying much of plaintiff's standing theory are just not accurate. This pre-sorting rule is either the same or more protective of public health than the rule that it replaced. So plaintiffs obviously cannot premise standing on that kind of change. I would urge the Court to refer to Appendix 534 and 535. That's the description of pre-sorting under the traditional system and compare that with the regulation here. There's the same record-keeping requirements, but now there are additional record-keeping and the disease notification. That's the only part of the rule that plaintiffs challenge. It's the same or better than what came before. That ought to be the end of their standing theories here. What troubles me about that is that what the merits of this case are about, I take it, is not whether this is a good rule or a bad rule for public health. The merits are about whether the regulation conflicts with the statute. That seems a relatively simple, not necessarily easy, but a simple question. We look at the words of the statute and see what they seem to say and use our tools of statutory interpretation to decide that. What you're suggesting is that in order to establish standing of, let's take what I think is the strongest of their cases, weak as it may be, Mr. Washburn, the pork-eater and pork-handler, before we can characterize his claim of risk of injury as non-speculative, we would have to decide not the simple, straightforward, right in the wheelhouse of judges' issue of statutory interpretation. We would have to decide whether this is a good rule or a bad rule. We would have to decide, as an empirical matter, are the regulations that are in place, that are proposed and that are challenged, better or worse for public health than the rules that they replace? Is that what you're telling us? Not quite, Your Honor. The standing question here with respect to the Washburn theory, we can call it, is whether they've shown a substantial and imminent risk that this particular change in the rule is going to lead to injure Washburn. In order to have standing based on an increased risk, the risk has to be certainly impending or imminent and, like, real and concrete. And if, in fact, you have to do a bunch of analysis to determine whether, in fact, there's going to be an increased risk or not, you just think that that means it fails the test. It doesn't mean we have to figure out exactly what the effect on food safety is going to be. That's right, Your Honor. And the burden here is on plaintiffs. As was pointed out earlier, this is summary judgment. They've got to come forward with actual evidence showing that there is this substantial and imminent risk. You know, this rule has been around for a long time now. There was the waiver program as well. They haven't identified evidence that this pre-sorting has ever or would ever create this kind of risk. Okay, I get that argument, and right. So what about this? Since we're talking about food safety, what about this Bauer case that we've decided before? Why doesn't that dictate an answer here? So, Your Honor, Bauer and then NRDC, which is the post-Clapper case that's applying Bauer, they recognize that there can be this kind of food safety theory, but they don't say that there's always standing there or that there's never standing. Instead, it's a fact-specific analysis, and the problem for plaintiffs here is they just don't have the facts. So the way you would distinguish Bauer is that in Bauer we were dealing with mad cow disease, which was a known definite risk, and the regulation allowed diseased cows into the food stream, and so there was a factual basis there for a better factual basis. Because I don't think my question of Bauer is not that there was a long discussion of is this a good rule or a bad rule. It was very specific to those facts. Is that the difference between this and that? Your Honor, I would distinguish Bauer in two ways. One is the kind of evidence available. So in Bauer, the court actually emphasized that there were government studies that acknowledged there's a real risk here. Obviously, there's nothing like that in this case. And the other difference, which I think is related to Your Honor's question, is that in Bauer the rule was sort of an on-off switch. The agency was allowing a category of potentially risky products into the marketplace. That's not what's happening here. The agency is doing inspections of all animals that are going to the marketplace, and to the extent plaintiff's argument is, well, maybe some animals will sneak into the line, there's an enormous number of safeguards in place to prevent that. All right. So just to be—so you said on-off switch. So like a way to say that Bauer is different from this case is to say that in that case he's exposed to a risk that the government is doing nothing about, and so it looks more like a concrete risk if you say I'm exposed to a risk, period, and I wouldn't be if you did something about it as versus like the degree of protection for food safety. That looks more speculative and less concrete. I think that's right, Your Honor. The one other point I'd make about Bauer is that's a 2003 case, so— So it might have been overtaken by subsequent standing cases. Right. Especially like the Alliance for Bureaucratic Medicine and those kinds of cases. That's right, Your Honor. There's been about 20 years of the Supreme Court really tightening up on standing, and I point to this court's NRDC decision, which is cited in Plaintiff's reply, that is doing a much more careful analysis of standing in this food safety context. But it is. The district court in this case thought there was standing based on impairment of organizational mission, right? It did, Your Honor. I don't take plaintiffs to be meaningfully— To even be defending that. —to defending that. I don't think it is defensible. So it's telling me that what the district court said about standing was not correct. That's right, Your Honor. I think after Alliance, it's clear that those theories just don't work anymore. So what about farm sanctuaries? So farm sanctuary, their claim is there's going to be more sick pigs and it's going to be more expensive to take care of the pigs you want to take care of. Why isn't that sufficient? Your Honor, there's a legal problem with that and a factual one. I think the legal problem is that's voluntary, right? I mean, if they want to take care of more sick pigs, they can. But that's not something that this rule is requiring them to do. And the factual problem is there's nothing in the record showing that as a result of this pretty narrow part of the rule, there would be any sort of increase in the disease risk of pigs. As I mentioned, there are many safeguards built in here, not just the employees who are supposed to notify about diseases, not just the oversight by federal inspectors. There's also the federal inspectors who are looking at every pig in the truck. Not that actually they've shown that there will be an increase in disease, but even if there were, it looks a lot like impairment of organizational mission. They're just saying you're exacerbating a social problem that we want to address, and so we're going to have to spend more money to address it. I think that's absolutely right, Your Honor. It's impairment of organizational mission in the form of pigs rather than the form of educational materials, but I think the alliance principles still apply. Could you address how much, and I understand the argument in light of, I think of it as hypocritical for whatever the FDA alliance case, however you want to call it. I understand that argument. We also have some of our precedents, like Connecticut Parents Union, where we say that you can't establish an injury, quote, absent an involuntary material burden on an organization's established core activities. And I understand the argument. On the other side is that these are the core activities that they've always been engaged in, right? They're not looking to do something new or different, at least with respect to farm sanctuary. To what extent do you think if we were ruling in favor, say under FDA alliance, we would have to say that that has somehow abrogated or narrowed the principle that we have outlined in some of our previous cases? And how much do you think that ruling for you could fit both within FDA alliance and some of our court's cases? You know what I mean? Are you looking to when do we need to say somehow, are we constrained by some of our panel precedents, would we need to go on bond to revisit them, or do you think that there's room for us to comply both with FDA alliance and to fit within our own precedents? Your Honor, I think there's plenty of room to fit within both of those strains. As I read this court's precedents, there was a trend toward tightening up on these kind of theories and requiring not just some effect on what the organization is doing, but that it not be voluntary, that it be involuntary. I think that's the principle that alliance makes clear. And so whether this court has sort of gone all the way that alliance did is kind of immaterial. There's a Supreme Court precedent, and it forecloses these standings. Well, I'm thinking mechanically in terms of when we sometimes do encounter Supreme Court cases that are intervening and then some parties say, well, hey, they've effectively overridden some of what your precedent is, then we have to, as a court, deal with it institutionally, how we address those. That's why I'm wondering whether you even think that we have to, whether there is any inconsistencies there or whether somehow you can thread the needle and you win without us having to say, well, this is intention. Ruling for you would be somehow intention. And I'm thinking of Connecticut Parents Union or whatever that is, Centro. I'm going to get the name wrong, like Centro Hispano. The case out in, I think it was Long Island. Yes, Your Honor. I was just about to bring up the Connecticut Parents case. That one I read as saying, as emphasizing the sort of not voluntary. It's got to be something that is involuntary as a result of this rule. So I think we would win even under that. The thing with our precedents is that they don't allow this kind of loose impairment of organizational mission. But you'd agree that to the extent we read our precedents as authorizing that kind of standing, well, that just critically conflicts with Alliance for Democratic Medicine. So it wouldn't be like, well, it's not clear. This report is kind of cast doubt. And maybe we should go on bonk to reconsider it. Let's just squarely foreclosed. That's right, Your Honor. And I don't take plaintiffs to really have argued otherwise today. Unless the Court has any further questions on standing. Can I ask about 603A? So why isn't it that sort of a natural understanding of a fluttering establishment would be the premises of the business? So, Your Honor, the way that the agency has understood this from the very beginning is that for the inspection requirement to be triggered, two things need to be true. One, the pig needs to enter the premises. And two, it needs to be slaughtered for use in commerce. So there's like an intent requirement. The establishment wants to slaughter the pig. And you have actually came on. I mean, I think a lot depends on what the establishment is. Because let's say the slaughtering establishment is the campus of the slaughtering business, which is a natural way to understand establishment. The pigs are entering the premises of the business to be slaughtered and the meat, food, products thereof to be used in commerce. And the sorting doesn't happen until after it's arrived. But if the statute actually requires the inspection to occur before it arrives, then the intent requirement would be met for all the animals that enter the premises, right? I don't think that's right, Your Honor. In the pre-sorting regime, that intent hasn't been formed when the truck enters the gates. Just to be sort of concrete about how this USDA has done this, there's a pen card, like literally a card on the pen. And the establishment says, you know, we're offering 30 pigs for slaughter. And the agency, you know, since 1906 or since this 1914— Wait, sorry. There's one on the pen? There's a card where the establishment says we're offering, you know, 30 pigs for slaughter or whatever it is. And so historically, the way that the agency has done this is to say, we're going to inspect every pig that is both on the premises and they're being offered for slaughter, right? Like here are the 30 that we intend to slaughter for use in commerce. Well, I mean, I guess you have both of these arguments. But one idea is that the slaughtering establishment is only the part of the premises where the slaughtering occurs, which might explain why you do the inspection in the pen. But you're saying it is also that we don't know that they're entering the facility to be slaughtered and to use their meat products in commerce until they form that intent? That's right, Your Honor. And if I could skip— The statute wouldn't make a lot of sense because it does say all, you know, you do the inspection before they shall be allowed to enter into any slaughtering establishment. So, Bryce? Your Honor, that is in the language of the statute. This is how the agency has understood it for a hundred years. I think that gets significant weight under Loeb or Bright, the agency's contemporaneous construction of the statute. And I'll just note that even plaintiffs aren't arguing that inspections need to happen before the gates. To me, that's fatal to this line of statutory argument. If you can see that inspections can happen in the pens, then I don't know why adding this pre-sorting would be a problem under the statute. But the theory—is the theory one or the other or both of these things, that the establishment is only the part of the facility where the slaughtering occurs or that the inspection is not required until the intent is formed to offer the animals for slaughter? Your Honor, the way that the agency has understood this is the second of those theories. That's what it's expressed in regulations again and again. Isn't it another way of saying the same thing? You know, that that intent requirement informs what establishment must mean in this context. I think these two paths probably lead—I mean, they definitely lead to the same place in this case. I'm just—I want the Court to be aware that the way that the agency has understood it, including in these regulations, is that there are these two prerequisites, entry plus intent. And obviously, under that reading of the statute, this rule is, you know, resulting in inspections of every pig that Congress intended to be inspected. That's also consistent with the statute structure. Congress told us that the purpose here is to prevent adulterated meat from entering the food supply. Under this rule, every pig that's going to be in the food supply is subject to federal inspections, just as they have been for 100 years. And that's also probative of when you do the inspection, because in order to protect the food supply, you should do the inspection at the time of the slaughter. But if you had to do the inspection before it even got to the place, then maybe there'd be a lag. That's absolutely right, Your Honor. I think that's one of the public health problems with their argument. If there was a time gap between the inspection and the slaughter, that could potentially, you know, introduce sort of new risks and things like that. Unless the Court has any further questions, we ask that— What about the humane handling methods? Is that a reasonable objection that you didn't adequately consider that? We did adequately consider that. The rule, which is close to 100 pages and goes through a lot of these comments in great detail, the rule explains that we've done this study and concluded that, under the rule, there was actually more time for these humane verifications than there was before. I'll also note— Because the idea is that if the inspectors spend less time on the line, they can pay attention to the overall methods of slaughter. That's right, Your Honor, including these various humane verification checks. Which is nice in theory. Of course, if the government responds in the appropriations process to the greater efficiency of inspections on the line by laying off more inspectors, that kind of undermines that rationale, right? Your Honor, I don't understand that to be part of plaintiff's theory in this case. But it's just a sort of irony. I mean, we are assuming that if you have a constant number of inspectors and they spend less time inspecting the pigs and the antemortem on the way to the slaughterhouse operation because some of the sickest pigs are already— they don't have to look at it at all because they've been taken away. So they could spend more time looking at what happens inside the slaughterhouse, inspecting the methods, which are not— Excuse me, it's a question of what's the system supposed to be, not making sure there are never any violations of that system. But that's a bit of a hollow promise because that depends on the assumption that there is a constant N for the number of inspectors who are available. Your Honor, if plaintiffs wanted to bring another case with evidence and that theory— Otherwise, there would be a different lawsuit that would somehow be trying to compel Congress to keep the number of inspectors constant or something like that. I'm just noting that this is—there's going to be more time. Sounds good and probably is good enough to solve—to deal with this problem as a legal matter. But really, I don't know if that's— The rule says that the reason why this is justified is because the inspectors can be moved to other areas offline, right? That's right, Your Honor. So that's the intention of the rule. That's the intention of the rule. If the USDA undertakes a reduction in force later on that might undermine their ability to do that, you could have litigation over that. I suspect we would have a lot of threshold arguments in that litigation, but obviously it would be a separate case. One last point on— No, there is, in fact, litigation over agencies undertaking a reduction in force. Indeed, Your Honor. One last point, if I may, on humane handling. Yeah, just one last point. Just factually, plaintiffs have suggested that we're not doing the same checks that we did before. USDA is. So Appendix 548 says, you know, we're still doing sort of the full list of checks. That includes when they come off the truck. It includes a check for how are sick or disabled pigs treated. Appendix 567 to 69 lists the full series of checks. They were happening under the prior rules. They're happening now, and so there's just no basis for this humane handling argument.  Thank you very much. Why don't we hear from Attorney Hoffman for the appellant. And this time, don't worry. You'll only be the two minutes for rebuttal. Thank you, Your Honor. I have three points, and also to answer the question about the 93%. In the final rule at 52322, it says that the establishments it expects to opt into NSIS account for 93% of total swine slaughter annually. So this is the projection of 93% coverage. So three points. The first one is the harm that we're concerned about in this case can be caused by missing diseased animals. For example, there's a regulation 309.7 about anthrax. It says that when inspectors are conducting anti-mortem inspection, if they diagnose a pig as having anthrax, they must find all the other animals that arrived with that animal, inspect them specially, and slaughter them separately. And these are animals that have no symptoms. But to keep them out of the food supply and to keep anthrax out of the food supply, the inspectors need to see the animal that had anthrax and diagnose it, as opposed to having slaughterhouse employees with no training do that. Second, the question of whether voluntary segregation was the same as the regulations, which it is not, goes to the merits. And the Court is not to consider the merits on standing. That's discussed in our brief. Third, the question of what the slaughtering establishment is. In 603B, the Humane Handling Clause, it also says slaughtering establishment. And when the Supreme Court interpreted the whole FMIA scheme in National Meat Association v. Harris, it found that that slaughterhouse establishment begins at the gate. That is what the establishment consists of. If there are no questions, thank you. But the opposing counsel just said the justification that the agency has relied on is not primarily what the establishment is. It's the idea that the statute has two requirements. One is entering to the establishment, and two is the intent to offer the animal for slaughter. So what about that? The intent is not in the statute. What is in the statute— But before they shall be allowed to enter the establishment, where they are to be slaughtered and the meat products to be entered into commerce? Yes. Are to be slaughtered. Okay. When is it decided that an animal is to be slaughtered? That happens at the gate. Which is at the gate they intend to offer them to slaughter. And therefore, all those animals must be inspected. But Mr. Hazel just said that the way it works is they're in the pen. And from the pen, the company says, we are offering 30 animals for slaughter at this point. We haven't made a decision about the other ones. Right? So he said that actually the way it operates in practice is the intent is to form where the animals are in the pen. There is no support for that in the statute. Okay. Thank you very much. We have your arguments. Thank you. Thank you very much to both counsel. These were very helpful arguments. We appreciate the time you spent with us today. We will take the case under advisement.